UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CRISTIE CISNEROS,

                Plaintiff,                                  Case No. 14-cv-14893

v.                                              Honorable Thomas L. Ludington

FIRSTMERIT CORPORATION and
LPL FINANCIAL, LLC,

                Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT WITH PREJUDICE**

The circumstances leading to Plaintiff Cristie Cisneros's departure from Defendants FirstMerit Corporation and LPL Financial, LLC may be inexplicable. Unfortunately for her, the evidence she has developed does not demonstrate that Defendants' conduct was undertaken in retaliation against her for exercising her rights under the Family and Medical Leave Act ("FMLA" or "Act"), 29 U.S.C. § 2601*ff.*

Defendants have moved for summary judgment, arguing that Cisneros cannot demonstrate a genuine dispute of material fact that her protected FMLA activity was related to her termination by Defendants.[1] *See* Defs.' Mots. Summ. J., ECF Nos. 28 & 29. Because Cisneros cannot demonstrate a causal connection between her protected activity and the adverse employment actions taken by Defendants, she cannot establish a prima facie case of FMLA retaliation. Accordingly, Defendants' motions will be granted and Cisneros's complaint will be dismissed with prejudice.

---

[1] As explained *infra*, LPL Financial terminated professional licenses held by Cisneros but did not terminate her employment.

## I.

Plaintiff Cisneros is a resident of Saginaw County, Michigan and formerly worked as a financial advisor for Defendant FirstMerit. While working as a financial advisor for FirstMerit she held her securities licenses with Defendant LPL, which maintained a contractual relationship with FirstMerit.

Defendant FirstMerit is a financial services company that operates a number of regional banks throughout the Midwest. One of the financial services it provides to clients is the ability to invest in publicly offered securities and other advanced financial products not offered over the counter at their retail banks. FirstMerit, however, is not a registered broker-dealer of public securities. As a result, it can only offer these services in cooperation with a registered securities broker. Defendant LPL is that broker-dealer. FirstMerit employs financial advisors that consult with clients on the purchase of securities and financial products. Its financial advisors hold their securities licenses, required by federal law, through LPL. LPL also functions to place trades on behalf of FirstMerit and its financial advisors.

## A.

Cisneros was hired by Citizens Republic Bancorp on June 16, 2003 as a part-time customer service representative. In June of 2005, she became a full-time employee. Cisneros was promoted again on September 1, 2009 to the position of financial advisor. As a financial advisor, Cisneros was required to obtain two investment licenses through the Financial Industry Regulatory Authority, Inc. ("FINRA"). These are Series 7 and Series 66 licenses. The Series 7 license enables the holder of the license to sell investments and the Series 66 license enables the individual holder to advise clients on investments.

Citizens was not a registered broker and cannot hold Cisneros's investment licenses. It was necessary, if Citizens were to employ financial advisors to sell investments on its behalf, that the financial advisors hold valid investment licenses. To accomplish this without itself becoming a broker, Citizens contracted with Defendant LPL, a broker, to hold its financial advisors' licenses. Cisneros's licenses were held by LPL. A financial advisor cannot actively trade securities if his or her license is not held by a registered securities broker.

As a financial advisor holding her securities licenses through LPL, Cisneros was subject to a number of LPL policies and standards of review. LPL could and somewhat regularly would perform audits of Cisneros's sales. LPL also provided Cisneros with continuing education opportunities and regularly corresponded with Cisneros about her performance. The subject of many interactions between LPL and financial advisors such as Cisneros involved new products available to the customers of the financial advisors. LPL also reviewed all sales made by financial advisors after they were made. LPL had the ability, if it felt necessary, to prescreen sales and prevent a financial advisor from closing transactions until they were reviewed by LPL.

Additionally, if products sold to customers resulted in a complaint, the complaint would ultimately be resolved by Citzens (or, later, FirstMerit) but would be handled in tandem with LPL. If complaints reflected potential violations of a federal securities law or regulation, or simply reflected the possibility that a financial advisors conduct ran afoul of LPL's business practices, LPL could initiate a review. Cisneros was subject to such a review in 2012 and from late 2013 to early 2014. The first review did not, according to the record, result in any disciplinary or coaching action by LPL, although it had the ability to institute either.

**B.**

- 3 -

At some point while working as a financial advisor, Cisneros began working with a client that made frequent large annuity purchases. The dollar amount of purchases being made through Cisneros relative to the volume of her other business initially raised some concerns within Citizens and FirstMerit. This led to an LPL employee, Shayne Escobar, performing an inquiry into the purchases in 2012. Nothing of concern appeared during the review such that any corrective action was necessary. There is evidence from 2012 that a compliance officer for Citizens felt there was some concern with Cisneros's product mix (that is, that she was selling an outsize percentage of annuities relative to other products) but these concerns, as far as the record reveals, were never formalized and did not result in any discipline or coaching.

In April of 2013, Citizens and FirstMerit merged, and retail banking operations continued under the FirstMerit name. All prior employees of Citizens, such as Cisneros, were now FirstMerit employees. At the time of the merger, LPL was serving as Citizens broker but did not hold the same position with FirstMerit. As FirstMerit absorbed Citizens' banking operations, it chose to retain LPL as its broker for trades placed through financial advisors like Cisneros.

### C.

Cisneros began suffering from the symptoms of a severe migraine headache on March 18, 2013. Because of these symptoms she was admitted at the Covenant Medical Center's emergency room. She remained admitted until March 21, 2013. During her time at the hospital she was diagnosed "with a complex migraine" but a consulting physician "remained concerned about a potential transient ischemic attack and seizure disorder." Pl.'s Resp. Br. 3, ECF No. 31.

While at the hospital Cisneros was contacted by a co-worker looking to schedule an appointment involving Cisneros and a customer. Cisneros informed her co-worker that she was hospitalized. Later that same day, Cisneros notified her supervisor of her status. The information

about Cisneros's condition eventually reached FirstMerit's compliance office and, according to Cisneros, her supervisor at LPL, Shayne Escobar.

Cisneros completed the paperwork provided to her by FirstMerit for obtaining FMLA leave. FirstMerit's third-party leave-administrator, Unum, did not classify Cisneros's migraine episode as a "serious health condition" and so denied her request for FMLA leave. Unum stated in its denial letter that there was an insufficient documentation of a serious health condition.

**D.**

Cisneros returned to work on April 10, 2013. According to Cisneros, when she returned there was a distinct shift in attitude toward her at FirstMerit and LPL. For example, she described her discussions with Shayne Escobar, her supervisor at LPL, as akin to an "inquisition" following her leave. Cisneros also felt that concerns about her product mix, in particular her large amount of annuity sales, were coming under inappropriately increased scrutiny. The issue of product mix arose within two weeks of her leave when FirstMerit's compliance officer, Jeremy Deloney, conducted an audit of Cisneros's performance on April 22, 2013. During the audit Mr. Deloney expressed concern with her product mix but stated that "[o]f course, your annuities are extremely high, but if we exclude [the customer making a number of large purchases] from this, you're right in line with where you should be." Cisneros Dep. 49, ECF No. 28-13. Cisneros claims that audits generally happen once every two years, but that Deloney's 2013 audit came on the heels of an audit of her performance the year before.

Cisneros was audited again by LPL in 2013. This audit occurred in August. Nothing remarkable occurred during the audit. Shortly after the audit was completed, however, the auditor contacted Cisneros and notified her that the auditor had uncovered a state court judgment against Cisneros that was not in Cisneros's credit report. The next day, another employee of

LPL, Suanne Grayson, contacted Cisneros, while copying in Mr. Deloney, to inform her that LPL had located the aforementioned judgment and an undisclosed compromise with a creditor. Cisneros believed that the judgment did not need to be disclosed on her FINRA disclosures, made through FINRA form U4, because it was resolved as a part of a bankruptcy she had successfully completed years before. Ms. Grayson confirmed Cisneros's position but stated that the credit compromise did need to be disclosed. Ms. Grayson presented Cisneros with an amended U4 disclosure form and Cisneros offered no objections to the changes Ms. Grayson made and agreed that it could be filed. As a result of the late disclosures Cisneros was fined $1,500 by FINRA. The fine was debited against her future sales commissions.

Not too long after LPL's audit where it learned of Cisneros's undisclosed credit compromise, Cisneros found herself in a meeting with Mr. Deloney from FirstMerit and Ms. Escobar from LPL. Mr. Deloney informed Cisneros that Ms. Escobar wished to discuss Cisneros's credit history as well as the client that accounted for the large majority of her overall sales and the large majority of her annuity sales. Up to this point in 2013, Cisneros's significant client resulted in Cisneros having the most sales of any financial advisor at FirstMerit. Ms. Escobar questioned the nature of this client's purchases and his financial situation. She went on to ask Cisneros why, if Cisneros was making so much money from commissions, she had trouble paying her creditors. Cisneros communicated that she believed Ms. Escobar's questioning had crossed a line. To which Ms. Escobar responded by saying "that if [Cisneros] cooperated with her, things would go better for [Cisneros]." Cisneros Dep. 72, ECF No. 28-13. When Ms. Escobar left the call, Mr. Deloney told Cisneros that she had done nothing wrong.

**E.**

At the beginning of 2014, Cisneros had a new supervisor, her former co-worker Marc Kaeckmeister. Also at the beginning of 2014, Cisneros received her sales goals for the coming year. These goals were set by Mr. Kaeckmeister in cooperation with the head of all financial advisors at FirstMerit, Michael Sonego. Cisneros's sales goal was increased from $240,000 in 2013 to $575,000 in 2014. Cisneros sales in 2013 were $684,552.58, 285% of her sales goal for the year. By contrast, Dave Jackson, the second highest earning financial advisor at FirstMerit in 2013 with $615,095.40 in gross commissions saw his sales goal reduced from $528,000 in 2013 to $450,000 in 2014.

In addition to seeing her sales goals altered, Cisneros felt that she received unfair bonus compensation. Cisneros's bonus came in roughly $5,000 less than what she anticipated based on her performance in 2013. She sought information concerning her bonus calculation from Mr. Kaeckmeister but was unable to obtain it. She claims that in the past she used to receive documentation of bonus compensation or at least an explanation of how it was calculated. According to Mr. Kaeckmeister, bonuses for FirstMerit financial advisors were reduced across the board and are determined on a simple percentage basis.

Finally, in recognition for her large amount of sales during 2013, Cisneros was awarded two incentive trips. One was awarded by FirstMerit and the other by LPL. According to Cisneros, FirstMerit's financial advisor supervisor, Mr. Sonego, called her and told her that she could only take one of the trips. Cisneros was uncomfortable choosing between two trips that she earned, but Mr. Sonego reportedly stated that FirstMerit believed it was "overboard" for her to go on both trips. Cisneros Dep. 88, ECF No. 28-13. Cisneros came to learn later that her second incentive trip was taken by Mr. Kaeckmeister. Cisneros also claims that another financial advisor at FirstMerit, Wendy Mueller, has taken multiple incentive trips in one year.

- 7 -

**F.**

Also at the beginning of 2014, FirstMerit was undergoing internal restructuring. Part of restructuring involved FirstMerit closing branches in the Michigan region. Financial advisors were assigned branches from which they would receive client referrals. One of the branches that closed was assigned to Cisneros. When the branch closed she requested that Mr. Kaeckmeister assign her a new branch to compensate for the closed one. This request was denied. Mr. Kaeckmeister testified that there was a net reduction in branches, so assigning Cisneros an extra branch would mean reducing branches assigned to other financial advisors. But Cisneros testified at her deposition that another financial advisor was assigned additional branches during this time of contraction.

The restructuring at FirstMerit also affected the support services available to financial advisors. At one point, dedicated support staff was assigned to financial advisors like Cisneros. But during restructuring, FirstMerit moved to a common support pool. To implement this change, Mr. Kaeckmeister and Mr. Sonego detailed internal management guidelines for determining how to apportion support staff. Under the guidelines a financial advisor with at least $425,000 in gross commissions was eligible for one-to-one support. Cisneros would, under the guidelines, meet that requirement. She was not, however, assigned one-to-one support. She did not even receive shared support—where a support person is assigned to multiple financial advisors but only those financial advisors. Instead, she had to seek support from the central support pool.

**G.**

In February 2014, Cisneros was the subject of a customer complaint that resulted in a settlement between FirstMerit and the client making the complaint. This was Cisneros's fourth

complaint in less than three years and the second of the four that resulted in a settlement.[2] Financial advisors receive an average of one complaint every three years. Cisneros received two complaints in late 2011, one of which resulted in settlement. She received her third complaint in October of 2013. All of Cisneros's complaints raised issues concerning the propriety of her product mix. Namely, there were concerns raised by the complaints that Cisneros was pushing annuities too aggressively, both fixed and variable, without appropriately considering whether annuities were best for her client. These concerns on the part of FirstMerit and LPL date back to at least April 2013 during Cisneros's audit by FirstMerit. LPL, particularly Ms. Escobar, began investigating the propriety of Cisneros's product mix and her ability to profile customers in late 2013.

After Cisneros's complaint in February 2014, FirstMerit and LPL decided that she needed a supervision plan so that they could properly assess how she profiled clients. The first meeting concerning Cisneros's complaint and broader sales practices came on March 25, 2014. Cisneros met with Mr. Deloney, Mr. Kaeckmeister, and Mr. Sonego. The meeting started with Mr. Sonego communicating that LPL had concerns about Cisneros's product mix. Mr. Sonego also stated that Ms. Escobar had expressed concerns about Cisneros's general attitude and Cisneros's care for her clients. He continued to state that FirstMerit would draft a supervision plan and Cisneros would need to comply with it. At some point during the meeting, Mr. Sonego told Cisneros that she "can think he was an asshole all [she] wanted but that [she] was going to comply or find another job." Cisneros Dep. 110, ECF No. 28-13.

---

[2]    Not all complaints result in settlement. Settlement usually occurs where FirstMerit can substantiate the client's complaint and believes that the client's complaint has some merit. Unsettled complaints do not always mean the financial advisor is not at fault, but can mean simply that FirstMerit was unable to substantiate the client's complaint sufficient to reach a settlement regarding the subject investment.

During the March meeting, Mr. Kaeckmeister explained to Cisneros that she would need to undergo training akin to the training she received when she first started as a financial advisor. He then presented her with a list of deficiencies he had identified in her performance. The list included not attending conference calls and having a product mix skewed toward annuities. Cisneros claimed that she was on vacation during two of the conference calls and that her product mix was in line if her one large customer that purchased a significant amount of annuities was excluded. Mr. Kaeckmeister told her that FirstMerit was not going to exclude her large customer in analyzing her product mix.

Following the meeting Mr. Kaeckmeister established specific appointments for him and Cisneros to meet. Cisneros stated that Mr. Kaeckmeister missed a number of these meetings. Additionally, he began sitting in on some of Cisneros's customer meetings.

## H.

The follow-up to the March meeting came on May 9, 2014, when Cisneros was scheduled to meet with FirstMerit and LPL representatives in Flint, Michigan. Mr. Kaeckmeister and Mr. Deloney attended the May 9th meeting for FirstMerit along with a FirstMerit human resources representative. Ms. Escober and her supervisor, William Dedmon, appeared by telephone on behalf of LPL. At the meeting FirstMerit and LPL presented Cisneros with separate supervision plans. FirstMerit's plan placed Cisneros on probation for ninety days. During that time she would be required to meet regularly with Mr. Kaeckmeister and Mr. Deloney. The human resources representative for FirstMerit read the document to Cisneros and then asked her to sign it. Cisneros refused. The human resources representative told Cisneros that whether she signed it or not, she was being placed on probation.

- 10 -

Ms. Escobar then read the heightened supervision plan prepared by LPL. The plan was to last twelve months and included certain restrictions on Cisneros's sales activity, including an inability to directly place sales. Cisneros would be required to pre-approve her fixed annuity sales with Ms. Escobar before the sale could be placed with the product carrier. The plan also permitted Mr. Kaeckmeister, Mr. Deloney, and Ms. Escobar to review all of Cisneros's transactions. Ms. Escobar could also contact clients directly after they had contact with Cisneros and question the clients about their experience. Finally, the supervision plan detailed a number of different professional improvement and educational training exercises Cisneros was required to participate in. Cisneros also refused to sign this plan.

Upon refusing to sign LPL's heightened supervision plan, Mr. Dedmon from LPL stated that LPL would terminate her licenses if she did not sign. By terminating her license, Cisneros would still have valid securities licenses but they would not be held by a registered broker, preventing Cisneros from being able to trade securities and other investment products.

On May 13, 2014, LPL informed Cisneros by letter that it terminated her securities registration and no longer held her license, effective that day. A conference call was held that day with the same individuals present at the May 9, 2014 meeting. Cisneros was told in person that LPL had terminated her license. FirstMerit representatives then told Cisneros that because LPL terminated her licenses she could no longer serve as a financial advisor so her employment would be terminated. There was no discussion of moving Cisneros to a non-financial advisor position.[3] Cisneros's employment with FirstMerit was terminated and this lawsuit followed.

---

[3]   As part of LPL's termination process it was required to submit to FINRA a form U5. LPL listed the reason for terminating Cisneros's licenses as "violating investment-related statutes, regulations, rules or industry standards of conduct" and when prompted to supply additional information, wrote "concerns regarding sales of fixed annuities." Pl.'s Resp., Ex. 23, ECF No. 32-26. FINRA required LPL to amend the form U5 to provide more specificity. LPL amended the form U5 to explain that there were "concerns regarding inadequate disclosure with respect to fixed annuity transactions." *Id*. at Ex. 24. FINRA again sought further clarity and LPL again amended the form U5. The second amendment explained that "representative declined heightened supervision plan required by

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.

FirstMerit and LPL have each moved for summary judgment. They both contend that Cisneros is unable to meet her prima facie case of FMLA retaliation. In the alternative, they

---

the firm based on concerns regarding inadequate disclosure with respect to fixed annuity transactions." *Id*. at Ex. 25. FINRA was satisfied with the final amendment.

argue that they each had legitimate non-discriminatory reasons for terminating her employment or, in the case of LPL, her license. As a threshold matter, LPL argues that it is not Cisneros's employer for purposes of the FMLA. As such, it asserts Cisneros's claims against it must be dismissed. LPL's claims, being logically precedent under the FMLA framework, will be addressed first. Since LPL is Cisneros's employer, FirstMerit and LPL's combined claims (that Cisneros cannot establish a prima facie case of FMLA retaliation) will then be addressed.

## A.

LPL makes a preliminary argument that it is not Cisneros's employer for purposes of the FMLA. Since it is not her employer, it cannot be liable for any alleged violation of the Act. The FMLA itself does not address employment by multiple entities. *Grace v. USCAR*, 521 F.3d 655, 663 (6th Cir. 2008). The joint employment framework comes from the regulations promulgated by the Department of Labor. 29 U.S.C. § 2654 (authorizing the Department of Labor to "prescribe such regulations as are necessary to carry out" the purpose of the statute). The regulations provide for two types of multiple-employment relationships: joint employment and integrated employment. 29 C.F.R. § 825.104(c)(1).

Under the integrated employer framework "[s]eparate entities will be deemed to be parts of a single employer for purposes of FMLA if they meet the integrated employer test." 29 C.F.R. § 825.104(c)(2). The FMLA regulations set forth the following test for determining if two employers are integrated for purposes of the Act:

> A determination of whether or not separate entities are an integrated employer is not determined by the application of any single criterion, but rather the entire relationship is to be reviewed in its totality. Factors considered in determining whether two or more entities are an integrated employer include:
>
> (i) Common management;
>
> (ii) Interrelation between operations;

- 13 -

(iii) Centralized control of labor relations; and

(iv) Degree of common ownership/financial control.

29 C.F.R. § 825.104(c)(2). The test is inapplicable here. Cisneros does not contend that there is any unity of management, operations, labor relations, or common ownership/financial control between FirstMerit and LPL. The two are entirely distinct organizations, united only by the agreement whereby FirstMerit financial advisors hold their investor licenses through LPL and LPL brokers all trades placed by those financial advisors. Otherwise, organizationally, the two entities are distinct.

That leaves the joint employer framework. Under this test "[w]here two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA." 29 C.F.R. § 825.106(a). Unlike integrated employers, "[j]oint employers may be separate and distinct entities with separate owners, managers, and facilities." *Id.* "In a joint employer relationship the analysis assumes separate legal entities exist but that they have chosen to handle certain aspects of their employer–employee relationships jointly." *Grace*, 521 F.3d at 665 (quoting *Schubert v. Bethesda Health Group, Inc.*, 319 F.Supp.2d 963, 970 (E.D. Mo. 2004)). There are three situations where the regulations will consider a joint employment relationship to exist:

(1) Where there is an arrangement between employers to share an employee's services or to interchange employees;

(2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

- 14 -

29 C.F.R. § 825.106(a)(1)–(3). The second situation is the only one relevant to the relationship between FirstMerit and LPL.

This specific instance of joint employment was at issue in *Grace v. USCAR*. 521 F.3d 655 (6th Cir. 2008). In *Grace*, the Sixth Circuit determined that there was a joint employment relationship between a staffing company and joint venture between three large automotive manufacturers focused on research and development. The staffing company provided employees for the joint venture's IT department. The Sixth Circuit determined that both companies exerted significant control over the plaintiff as an employee. The staffing company controlled the plaintiff's payroll and benefits but the joint venture supervised her day-to-day work and determined her salary and hours. *Id*. at 667. The Sixth Circuit's conclusion was aided by guidance from the Department of Labor that "joint employment will ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer." 29 C.F.R. § 825.106(b).

In arriving at its conclusion, the Sixth Circuit analyzed two cases from sister circuits that addressed joint employment: *Moreau v. Air France*, 356 F.3d 942 (9th Cir.2004); *Mahoney v. Nokia*, 444 F.Supp.2d 1246 (N.D.Fla.2006), *aff'd* 236 F. App'x 574 (11th Cir.2007). LPL relies on Moreau in arguing that it is not Cisneros's employer. In Moreau, the Ninth Circuit concluded that Air France was the employer of ground handling services employees that serviced its planes at San Francisco International Airport. Air France had contracted with a number of companies to provide those services and had no "responsibility for hiring, firing, promoting, and disciplining employees" of any of the services providers. *Moreau*, 356 F.3d at 949-50. And while Air France had some ability to control the employees by dictating standards that had to be met when servicing the planes, there were insufficient factors to merit a conclusion that Air France was a

- 15 -

joint employer. *Id*. at 950-51. The Ninth Circuit noted that an element of control does not mandate a finding of joint employment but that the regulations state only that joint employment *may* exist. *Id*. at 951.

By contrast, in *Mahoney*, much like in the case before the Sixth Circuit, the staffing agency and the supplied company shared employment responsibilities. The Sixth Circuit observed that, in *Mahoney*, the staffing agency "managed the plaintiff's benefits and performed all payroll functions for the [leased] employees" while the staffed company "supervised his day-to-day work, fixed his salary, and determined the number of hours that it needed the employee's services." *Grace*, 521 F.3d at 666. In *Mahoney*, however, the parties conceded a joint employer relationship. *Id*. at 666-67.

Cisneros's case falls somewhere between *Grace* and *Moreau*. While LPL exerts significantly less control over Cisneros than the joint venture exerted over the leased employees in *Grace*, it exerts far more control over her than Air France exerted over the employees of the service providers in *Moreau*. Indeed, LPL has the ability to closely monitor Cisneros's work and can discipline her when that work runs afoul of generally accepted practices of the industry, let alone investment laws or regulations. Furthermore, by way of discipline, LPL could have imposed restrictions that limited Cisneros from actually executing any trades, instead having to get them approved by LPL before they are entered. LPL's relationship with FirstMerit also goes beyond a mere staffing or convenience relationship. LPL receives a financial benefit from the performance of FirstMerit financial advisors that is directly commensurate to the merit of the advisors' performance. Accordingly, LPL awards incentive trips to high-performing financial advisors. Cisneros won such a trip. Finally, LPL had the ability to cease holding the investment licenses of FirstMerit's financial advisors, a condition it was aware would adversely affect the

employment status of the financial advisors with FirstMerit. That is, the advisors would no longer be able to serve in that position and would either be demoted or, as in the case of Cisneros, terminated.

Thus, viewing the facts of LPL's relationship with Cisneros and FirstMerit in the light most favorable to Cisneros's there is a material dispute of fact as to whether LPL was Cisneros's employer for purposes of the FMLA. For the sake of LPL's present motion, Cisneros is able to establish the second prong of her prima facie case: that LPL is an employer as defined by the FMLA.

### B.

The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from § 2615(a)(2). *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). Cisneros pleads only a retaliation claim under the FMLA.[4] The central issue raised by the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id.* (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). In other words, an employer's intent is relevant only in retaliation claims because those claims "impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.* (citing *Edgar*, 443 F.3d at 508) (emphasis original).

To establish a *prima facie* retaliation claim, a plaintiff must establish that:

(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the

---

[4]   LPL argues in their motion for summary judgment that Cisneros cannot establish a claim of FMLA interference. But Cisneros only argues that she was retaliated against for exercising her FMLA rights, not Defendants interfered with her FMLA rights. *See Hoff-Pierre v. Univ. Hosp., Inc.*, 523 F. App'x 313, 314 (6th Cir. 2013); *Huffman v. Speedway LLC*, Case No. 13-CV-12453, 2014 WL 5817321, at *1 (E.D. Mich. Nov. 10, 2014).

employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was causal connection between the protected FMLA activity and the adverse employment action."[5]

*Killian*, 454 F.3d at 556 (citing *Arban*, 345 F.3d at 404). Defendants do not contest that Cisneros engaged in protected FMLA activity. LPL contends that even if they are an employer for purposes of the FMLA, Cisneros cannot establish that it had knowledge of her leave. Both Defendants contest Cisneros's ability to prove the last two elements of her prima facie case.

**1.**

As an initial matter, LPL's claim that it did not know of Cisneros's protected activity is without merit. Under the joint-employment framework, knowledge on the part of a secondary employer is presumed if the primary employer (the employer administering the leave) had knowledge. *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008) (holding that a plaintiff "need only inform her primary employer of her intention to take leave" but that "the secondary employer is directly liable" for any prohibited acts under the FMLA). LPL cannot, under the joint employment framework of the FMLA, use its lack of actual knowledge of Cisneros's leave to shield itself from liability.

**2.**

Both Defendants challenge whether Cisneros was subject to an adverse employment action. The challenge by both Defendants is slightly misleading, however, since both concede that Cisneros's termination (in the case of LPL, the termination of her licenses that led to the termination of her employment with FirstMerit) was adverse. The termination, then, at a minimum satisfies the third prong of her prima facie case.

---

[5]   The Sixth Circuit "applies the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims under the FMLA." *Edgar v. JAC Products, Inc.* 443 F.3d 501, 508 (6th Cir. 2006) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001) and *Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 933 (E.D. Mich. 2005)) (internal citations omitted).

The parties disagree over whether a series of other actions taken by LPL and FirstMerit qualify as adverse employment actions. The upshot of this disagreement implicates the proximity between Cisneros's protected activity and any adverse employment action by Defendants. Cisneros's terminations occurred over one year after Cisneros's protected activity. Cisneros concedes both that the time gap between her protected activity and her terminations is too long to establish a per se causal nexus between the two and that there is no evidence that either employer considered her leave when making their termination decisions. As a result, Cisneros must somehow establish a closer temporal proximity between an adverse employment action and her protected activity. Cisneros argues that a whole series of actions, beginning with an audit by FirstMerit that occurred less than two weeks after she took FMLA leave, are independent adverse employment actions sufficient to establish FMLA liability.

Thus, the salient question is whether the actions taking place between Cisneros's protected activity and her termination are relevant to drawing a causal nexus between the two. This question bleeds into the fourth prong of Cisneros's prima facie case, in which she must demonstrate a causal connection. There are two issues to be sorted out. First, are the adverse employment actions claimed by Cisneros, other than her terminations, discrete adverse employment actions giving rise to FMLA liability? And second, are these actions merely part and parcel of her termination such that they began a process of adverse action that culminated in her termination? In the first case, the actions would give rise to independent FMLA liability. In the second, they would merely operate as a means by which the adverse employment action is drawn closer in time to her protected activity.

Establishing an adverse employment action in the retaliation context is "less onerous" than in the anti-discrimination context. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584,

- 19 -

595 (6th Cir. 2007). "In analyzing the significance of any given act of retaliation, context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)) (internal quotation marks omitted); *see also Crawford v. JP Morgan Chase & Co.*, 531 F. App'x 622, 627 (6th Cir. 2013) (adopting *Burlington N.*'s standard for adverse employment action in FMLA context). "An act that would be immaterial in some situations is material in others." *Id*. Establishing an adverse employment action in the retaliation context is a "relatively low bar." *Michael*, 496 F.3d at 596.

### i.

Despite this low bar, very few of the actions Cisneros claims are adverse truly are. The fact that Cisneros was subject to a regulatory penalty for not making appropriate disclosures to FINRA is not an adverse employment action. Cisneros does not and cannot reasonably contend that the disclosures were not required or that she failed to make them when they were due. Indeed, when asked by a compliance representative from LPL if the disclosures appeared in order, Cisneros gave her assent and did not contest the propriety of the disclosures. Cisneros does not explain how compliance with regulatory disclosure rules could constitute an adverse employment action.

Similarly, the alteration of Cisneros's performance goals was not an adverse action. Cisneros was, in 2013, the top financial advisor at FirstMerit. Her sales goals for 2014, just like all other financial advisors, were based on her prior year's performance. Ultimately, her sales goals for 2014 were set below her actual sales figures for 2013. It would be odd to conclude that

an individual who engages in protected activity under the FMLA cannot be placed in a more challenging work environment when their work clearly warrants such challenges. So holding would create a rule that employees taking FMLA leave should actually receive preferential treatment, rather than simply non-discriminatory or non-retaliatory treatment. That is not the law of the Sixth Circuit. *See James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 79 (6th Cir. 2007) (holding that an increased sales quota is not an adverse employment action because she kept working, kept receiving the same pay, and her employment conditions were essentially unchanged). Cisneros's increased sales goal is not an adverse employment action.

Cisneros next claims that she was deprived of a personal sales assistant and an additional branch out of which she could garner referrals. But, as Defendant FirstMerit explains, these are conditions that affected all financial advisors equally. FirstMerit, as a cost-saving mechanism, moved to a pool of support assistants. Cisneros does not explain how this affected her in particular. While there is some evidence in the record that a FirstMerit supervisor set internal guidelines that might have merited Cisneros receiving her own assistant, that supervisor explained that the guidelines were merely that: suggestive guidelines designed to conform to the circumstances of FirstMerit's pool of financial advisors. Because Cisneros was doing significant financial transactions, her transaction volume was low, and that did not warrant an independent assistant. Cisneros does not rebut this explanation. The loss of a branch by Cisneros was also something that affected financial advisors equally. The claim that FirstMerit chose to close one of her assigned branches as a form of retaliation against Cisneros is an incredible one. The loss of a branch that closed for financial reasons is not an action adverse specifically to Cisneros.

Next, Cisneros claims that she received a decreased bonus in 2014 for her 2013 performance. But, as with the actions explored above, this affected all financial advisors equally.

Her bonus was set as a percentage of her salary, same with all other financial advisors. FirstMerit, facing a down year, decided to reduce bonuses across the board. A reasonable employee cannot consider a firm-wide bonus reduction as imposing a chilling effect on that specific employee's ability to exercise protected rights.

Finally, Cisneros claims that being subjected to internal audits by FirstMerit and LPL were materially adverse. But they are not. The investigation into conduct by an employee is not, without more, an adverse employment action. *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 321 (6th Cir. 2013). In *Murphy*, the Sixth Circuit concluded that Murphy's complaints about defendant OSU's investigation into a citation she had received and her potential misuse of FMLA leave was not an independent adverse employment action. Likewise, FirstMerit and LPL's investigation into Cisneros's profiling of customers and her product mix are not materially adverse. During the course of the audits her job responsibilities and her duties did not change. While she had to answer to the employees conducting the audits, that was merely a "minor annoyance[]" that would not deter her from taking FMLA leave or reporting FMLA violations. *Burlington N.*, 548 U.S. at 68. Additionally, any inquiry into Cisneros's personal circumstances, while unwelcome, did not have a substantive effect on her employment. The questions by Shayne Escobar about Cisneros's financial situation and the fact that conversations with Escobar felt like "an inquisition" don't rise above the "simple lack of good manners" identified as non-actionable in *Burlington Northern*, 548 U.S. at 68.

**ii.**

That leaves the actions alleged by Cisneros that are materially adverse. They are: being forced to take only one of the two incentive trips that she earned, losing referrals in an assigned

branch, being placed on a performance improvement plan,[6] and being terminated. All of these actions would deter a reasonable employee from exercising his or her FMLA rights. Excessive discussion of these actions is unnecessary because, as will be explained below, they all fall outside of the relevant temporal period to establish a causal connection between them and Cisneros's protected activity.

### 3.

To satisfy the final prong of her prima facie case, Cisneros must demonstrate a causal connection between her protected activity and the adverse employment actions she was subject to. Defendants assert that Cisneros cannot establish the final element of her prima facie case: that there was a causal connection between her FMLA leave and the adverse employment action.  To satisfy this element, a plaintiff must present sufficient evidence to "raise [an] inference that her protected activity was the likely reason" for the adverse action.  *Sosby v. Miller Brewing Co.*, 211 F. App'x 382, 387 (6th Cir. 2006) (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990).  However, "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there [was] a causal connection between the retaliatory action and the protected activity." *Cutcher v. Kmart Corp.*, 364 F. App'x 183, 190 (6th Cir. 2010).

Cisneros concedes that she has no evidence of a connection other than mere temporal proximity.[7]  Although temporal proximity alone is generally insufficient to establish

---

[6]    Being placed on a performance improvement plan may not, without more be an adverse employment action. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). In *Michael*, the Sixth Circuit held that "[t]he retaliatory actions alleged by Michael, including her brief placement on paid administrative leave and the 90–day performance plan, appear to meet this relatively low bar" for establishing a materially adverse action. *Id.* at 596. Here, Cisneros's performance-improvement-plan was not accompanied by a period of paid leave but, based on its conditions, which included being closely supervised during the course of her duties and losing the ability to personally place sales, a juror could conclude that the plan was materially adverse.

[7]    Cisneros makes the argument that LPL continually changed its rationale for her termination when it twice amended the form U5 at the request of FINRA, *see* n.3 *supra*. Cisneros claims, on the basis of relevant Sixth Circuit

1:14-cv-14893-TLL-PTM   Doc # 38   Filed 02/08/16   Pg 24 of 26   Pg ID 1274

circumstantial evidence of a causal connection, the Sixth Circuit has clarified that, in some circumstances, temporal proximity alone can suffice to show a causal connection in a retaliation case: "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) (analyzing temporal proximity under the ADEA and Elliot-Larsen Civil Rights Act).[8]

With respect to claims for FMLA retaliation, the Sixth Circuit has held that a span of less than three months is sufficient to create an inference of a causal connection. *See Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (holding that a three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage). Here, Cisneros cannot demonstrate a reasonably close temporal proximity between her protected activity and the adverse employment actions she suffered.

Cisneros's protected activity occurred in March of 2013. The alleged adverse employment actions did not occur until at least January of 2014, more than nine months later.

---

precedent, that varying explanations for termination preclude summary judgment. Indeed. But LPL did not provide varying explanations for her termination. It merely proceeded to further clarify the explanation it originally provided to FINRA for terminating her license. No reasonable jury could conclude that the three progressive form U5 disclosures altered the reason LPL gave for terminating her license. All relate to Cisneros's alleged practice of improperly profiling customers and inappropriately pushing sales of annuities when other products might have been more appropriate. That was the basis for her heightened supervision plan and her declining to sign that plan was the basis for terminating her license. Nothing different was communicated in the form U5 disclosures.

[8]   The Sixth Circuit relies on other employment discrimination law to fill the gaps in FMLA case law. *See, e.g.*, *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008) (relying on ADA, ADEA, and Title VII cases); *Bryson*, 498 F.3d at 561 (same).

- 24 -

Cisneros also cannot use her subjective opinion that Ms. Escobar or others took a different attitude with her following her leave. Such a "subjective feeling" is insufficient to establish a causal connection. *Gambill v. Duke Energy Corp.*, 456 F. App'x 578, 588–89 (6th Cir. 2012). Cisneros also cannot attempt to connect inquiries in her product mix that led to her placement on a performance improvement plan to her ultimate termination. Although the two may be connected causally, the Sixth Circuit in *Murphy*, 549 F. App'x at 321 (6th Cir. 2013), explained that an investigation that leads to termination cannot be considered part of the termination to form a single adverse employment action. For that reason her termination and her placement on a performance improvement plan are limited in temporal scope to when they occurred in 2014.

Since all adverse employment actions taken against Cisneros occurred outside of the window the Sixth Circuit has said is per se sufficient to establish a causal connection, she must demonstrate some other, non-temporal connection to her protected activity. Cisneros concedes that she cannot. As a result, her claim that Defendants violated the FMLA must be dismissed.

**IV.**

Accordingly, it is **ORDERED** Defendants FirstMerit Corporation and LPL Financial, LLC's motions for summary judgment, ECF Nos. 28 & 29, are **GRANTED**.

It is further **ORDERED** that Plaintiff Cristie Cisneros's Complaint, ECF No. 1, is **DISMISSED with prejudice**.

Dated: February 8, 2016                                   s/Thomas L. Ludington
                                                          THOMAS L. LUDINGTON
                                                          United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 8, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager