UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CRISTIE CISNEROS,

                Plaintiff,                          Case No. 14-cv-14893

v.                                        Honorable Thomas L. Ludington

FIRSTMERIT CORPORATION and
LPL FINANCIAL, LLC,

                Defendants.

_____/

**OPINION AND ORDER GRANTING MOTION FOR RECONSIDERATION,
VACATING JUDGMENT, AMENDING OPINION AND ORDER, AND DENYING
MOTIONS FOR SUMMARY JUDGMENT**

On February 8, 2016 a Judgment in favor of Defendants FirstMerit Corporation and LPL

Financial, LLC, was entered against Plaintiff Cristie Cisneros. Judgment was entered pursuant to

the Court's February 8, 2016 Opinion and Order granting Defendants motions for summary

judgment. The February 8 Opinion concluded that there was no genuine dispute of material fact

that Cisneros was not terminated because she took leave under the Family and Medical Leave

Act ("FMLA").

On February 22, 2016, Cisneros timely moved for reconsideration. She argues that the

Court erred in determining that certain actions by FirstMerit and LPL were not adverse

employment actions. She also argues that the Court erred by not considering additional evidence

of causation beyond mere temporal proximity. Defendants were directed to respond to Cisneros's

motion. Her motion will be granted.

**I.**

Cisneros does not dispute the facts as conveyed in the Court's February 8, 2016 Opinion and Order. Those facts will be adopted as though fully recited herein. See Feb. 8, 2016 Op. & Order, ECF No. 38.

## II.

A motion for reconsideration will be granted if the moving party shows: "(1) a palpable defect, (2) the defect misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case." *Michigan Dept. of Treasury v. Michalec*, 181 F. Supp. 2d 731, 733-34 (E.D. Mich. 2002) (quoting E.D. Mich. LR 7.1(g)(3)). A "palpable defect" is "obvious, clear, unmistakable, manifest, or plain." *Id.* at 734 (citing *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 971 F. Supp. 2d 262, 278 (E.D. Mich. 1997).

## III.

Cisneros makes two primary claims in her motion for reconsideration. First, she argues that the Court did not properly consider certain actions taken by LPL and FirstMerit to be adverse employment actions. Second, she argues that the Court did not properly assess additional evidence of causation beyond mere temporal proximity.

### A.

Cisneros first argues that a number of actions taken by LPL and FirstMerit (predominantly FirstMerit) were adverse employment actions. These are: the required amendment of Cisneros's FINRA U4 disclosure form; the increase in her 2014 sales goals; the fact that she was not assigned a support assistant; and the fact that she was not assigned a replacement branch when one of her assigned branches closed. These will be addressed in turn.

#### 1.

First, as explained in the February 8, 2016 Opinion, there is no evidence that the amendment to the FINRA U4 disclosure form was in any way retaliatory. Cisneros has adduced no evidence concerning FINRA's disclosure requirements or produced any evidence that her credit compromise was not properly disclosed. She argued in her response to Defendants' motions for summary judgment and now argues in her motion for reconsideration that the amendment to the disclosure form was retaliatory. She does so without any support. Nothing in the record suggests that the amendment was made at the discretion of LPL or FirstMerit. Rather, LPL produced evidence in support of its motion for summary judgment that FINRA does in fact require the disclosure of credit compromises. *See* FINRA Advisor Impact Alert, Ex. 4, Def.'s Mot. Summ. J., ECF No. 28-5.

Cisneros attempts to create an inference of retaliation by explaining that "by focusing on the 'balance / as of' date and not the actual date of the compromise, this guaranteed that FINRA would find the disclosure untimely." Pl.'s Mot. Recons. 11, ECF No. 44. But the evidence in the record demonstrates that Cisneros had the opportunity to correct the U4 form to include the actual date of the compromise rather than the date included by LPL's compliance specialist. Cisneros was furnished the amended U4 that listed the date of her compromise as "01/04/2013 . . . EXACT DATE IS NOT KNOWN." Amended U4, Ex. 6, *id.*, ECF No. 28-7. LPL's compliance specialist, when furnishing the proposed amended U4 to Cisneros, advised her: "If you are satisfied with the amendment as it is, I can file this amendment without your manual signature if you respond to this email acknowledging that you have received the amendment prior to its filing." Amended U4 Email Exchange, Ex. 5, *id.*, ECF No. 28-6. Instead of responding with an exact compromise date that may have affected any possible penalty imposed

- 3 -

by FINRA, Cisneros responded: "I have received and reviewed the amendment to my U4 and have reviewed the attached disclosures." *Id*.

Cisneros's argument that this is an adverse employment action is without merit. She has produced no evidence of a different date that should have been used or that the different date would have avoided a penalty. Under the FINRA guidelines, any item—such as a credit compromise—that is disclosed late is subject to a penalty that reaches a maximum amount after sixty days. See FINRA Advisor Impact Alert, Ex. 4, Def.'s Mot. Summ. J., ECF No. 28-5 (detailing a penalty structure of "$100 for the first day late and $25 for each subsequent day, up to a maximum of 60 days and $1,575."). A disclosure is deemed late if not "filed with FINRA within 30 days of the occurrence." *Id*. Thus, for Cisneros to have avoided the maximum penalty, she would have had to demonstrate that her compromise occurred less than 90 days before the date she reported it.[1] The date provided for her compromise was January 4, 2013 and her amended U4 was submitted September 23, 2013. That is a 262 day gap. Cisneros did not propose an alternative date that should have been used in her amended U4, let alone one that would have avoided a FINRA penalty. Her claim is meritless.[2] The amended U4 was not retaliatory.

---

[1]    That provides for 30 days to disclose and the maximum penalty period of 60 days.

[2]    She also makes reference to the judgment she disclosed. But she does not explain how the disclosure of that judgment fits into her argument. She argues that it did not need to be disclosed. And, she argues, Suanne Grayson, LPL's compliance specialist, admitted in her deposition that it did not need to be disclosed. Yet in the amended U4 disclosure a specific note is made that the judgment was already disclosed. There is no evidence that the judgment could have been the basis for a FINRA penalty if the credit compromise was not disclosed. In any event, because the credit compromise was disclosed and did form the basis for the FINRA penalty imposed on Cisneros, the counterfactual of whether the judgment merited a penalty need not be entertained.

But to the extent Cisneros argues that the fact the judgment was reported at all was retaliatory, her argument is without merit. She cites to the deposition of Ms. Grayson in support of her claim that Ms. Grayson conceded the judgment did not need to be reported. But the deposition does not support Cisneros's claim. Ms. Grayson states unequivocally in her deposition that while the judgment lien was pending it needed to be reported. She only states that it does not need to be reported when she is asked if an unlicensed individual would need to disclose the judgment. She explains that someone who is not licensed would not need to disclose the judgment. That is, Cisneros was subject to the judgment prior to being licensed. Otherwise, an individual subject to FINRA's reporting requirements would need to disclose a judgment or lien. *See* FINRA Advisor Impact Alert, Ex. 4, Def.'s Mot. Summ. J., ECF No. 28-5 (requiring a U4 update for "[a]ll judgments or liens.")

- 4 -

**2.**

Next Cisneros claims the Court erred by not concluding that the increase in her sales goals was an adverse employment action. She does not explain how this was a palpable defect of law. All she offers is a rehashed argument that two financial advisors had their sales goals decreased and Cisneros had her sales goals increased. Additionally, she claims the Court misrepresented the holding of *James v. Metro. Gov't of Nashville*, 243 F. App'x 74 (6th Cir. 2007), because the February 8, 2016 Opinion explains in a parenthetical that the case concerned sales quotas when it actually concerned cataloguing quotas. Cisneros is correct that the February 8, 2016 Opinion incorrectly states the nature of the quotas in *James*. But that is not a palpable error of law, particularly where Cisneros offers no authority for her claim that her increased quota (that was still below her actual sales figure from the year before) is an adverse action.

Indeed, *James* did not deal with sales quotas. But the case does involve the imposition of *performance* quotas in excess of the performance output of an employee that engaged in protected action. The Sixth Circuit concluded that the imposition of such a quota was not an adverse employment action because it did not "significantly affect[] her professional advancement." *Id*. at 79. The only case to the contrary located by the Court (and which was not cited by Cisneros) is *Ross v. Campbell Soup Co.*, 237 F.3d 701, 708 (6th Cir. 2001). In *Ross*, the Sixth Circuit concluded that a host of actions by plaintiff's employer, including a "dramatic increase in his sales quotas," was evidence that the employer's reason for discharging the plaintiff was pretextual. The *Ross* court did not conclude that an increase in sales quotas was an

---

To the extent there is any ambiguity, it must be interpreted in favor of Cisneros. As explained above, however, there is no evidence that the penalty assessed for the credit compromise was improper. The only way disclosing the judgment lien would have any adverse impact on Cisneros is if the credit compromise did not result in a penalty. Under FINRA, an untimely amended disclosure cannot result in multiple penalties. Thus, Cisneros was not penalized for reporting the judgment lien separate from the penalty that was imposed for her reporting the credit compromise.

adverse employment action. Cisneros has furnished no authority in support of that conclusion. The only relevant authority, *James*, is to the contrary. Cisneros's argument that the increase was adverse is meritless.

Cisneros makes an additional argument that her increased sales goals demonstrate a causal relationship between her adverse employment action and her protected activity because she was treated differently than other employees. This argument is addressed below.

**3.**

Lastly, Cisneros argues that the Court erred by not considering as adverse the decision not to assign her a support assistant and not assign her a replacement branch after one of her branches closed. Cisneros objects that the February 8, 2016 Opinion "ignores the evidence that [she] was the only person who qualified for an independent service coordinator and did not receive one." Pl.'s Mot. Recons. 14, ECF No. 44. Similarly, Cisneros claims that "the Court ignores the evidence that the other financial advisor that had a branch close, Emily Rush, had an additional branch location assigned to her." *Id*.

Cisneros does not explain how these actions are adverse employment actions. It is her burden of production in establishing her prima facie case to demonstrate that these actions were adverse. *Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). "A materially adverse employment action in the retaliation context consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Not receiving a support assistant when the company was moving to pooled support does not meet this standard. Nor does not receiving a

replacement branch when multiple branches, some which were not assigned to Cisneros, have closed.

What may elevate these incidents to adverse employment actions is Cisneros's claim that she was being singled out in each instance. First, she was denied a support assistant despite being qualified for individual support based on her sales total. No other financial advisor received less support than they otherwise would have gotten under the modified support guidelines. Second, at least one other financial advisor in Cisneros's region did, according to Cisneros, receive a replacement branch after a number of branch closures in Michigan. This disparate treatment could rise to the level of dissuading Cisneros from making or supporting a charge of discrimination. But, like the other adverse employment actions Cisneros avers, these two incidents take place many months after she takes FMLA leave. Thus, Cisneros would need to furnish some additional evidence of causation to support her prima facie case of retaliation. Indeed, she argues in her motion for reconsideration that she has.

**B.**

Cisneros next argues that the February 8, 2016 Opinion erred by not properly evaluating her arguments concerning causation. The February 8, 2016 Opinion stated that "Cisneros concedes that she has no evidence of a connection other than mere temporal proximity." Feb. 8 Op. 23, ECF No. 38. This was in error. Cisneros made two additional claims of causation: that FirstMerit attempted to "build a file" against Cisneros and that she was treated differently from other employees.

**1.**

First, Cisneros claims that she demonstrated causation because FirstMerit was attempting to "build a file" against her. In support of this claim she cites *Oldham v. Merrill, Lynch, Pierce,*

*Fenner & Smith, Inc.*, 124 F.3d 198 (6th Cir. 1997). But *Oldham* does not support the conclusion that Cisneros's proposes. In fact, *Oldham* does not at all address how "building a file" relates to the causation prong in establishing a prima facie case of discrimination because that was not an issue before the court in that case. *Oldham* was addressing whether "building a file" can be evidence of pretext. Cisneros has not produced any authority for the claim that "building a file" is evidence of causation. Her claim is without merit.

But putting to one side *Oldham*'s inappositeness, it still does not aid Cisneros. In *Oldham*, the Sixth Circuit narrowly construed a prior holding to mean that "the deliberate building of an adverse file on an employee can, on the right set of facts, constitute evidence of pretext." *Id*. at *4 (discussing *Few v. Yellow Freight System, Inc.*, 845 F.2d 123 (6th Cir. 1988)). The Sixth Circuit distinguished *Oldham* from its prior holding because in the prior case, *Few*,

> . . . a supervisor was instructed to "start documenting the plaintiffs [sic] personnel file whenever a mistake was made by her . . . in order to eventually terminate her employment," and that the plaintiff had previously had only eight write-ups in her personnel file during four and one-half years on the job, but accumulated sixteen write-ups during the four months following the decision to create an adverse file.

*Id*. (quoting *Few*, 845 F.2d at 124). The Sixth Circuit then rejected Oldham's argument that her employer's reason for termination was pretextual because it "built a file" against her. The Sixth Circuit explained that she had "presented no evidence that a deliberate decision was made to 'build up a file' against her—the only testimony that would even begin to support such a conclusion is her testimony that [a supervisor] convinced [her coworkers] to lower their ratings of her." *Id*. The court then concluded that "[t]his alone, especially given the evidence that [her coworkers] and at least one client had, of their own volition, complained about Oldham, amounts to a 'mere scintilla' of evidence of pretext and is insufficient to withstand summary judgment." *Id*.

- 8 -

Applying the reasoning of *Oldham* to Cisneros's case does not lead to the conclusion that FirstMerit was building a file against her. In the period leading up to her termination, Cisneros accumulated two client complaints about being sold an improper product—an annuity. These two complaints were consistent with two other complaints made long before Cisneros took FMLA leave. Those prior client complaints alleged dissatisfaction with a product sold by Cisneros—an annuity.

There is also no evidence of a deliberate attempt to build a file other than Cisneros's allegation that James Deloney, FirstMerit's compliance officer, told her one thing about her product mix during an internal audit but then recorded something different in his write-up of the meeting. But the Cisneros's account of the meeting and the notes prepared by Mr. Deloney are not contradictory. Mr. Deloney notes that he discussed product mix with Cisneros, something she concedes occurred. Cisneros claims that Mr. Deloney stated "Of course, your annuities are extremely high, but if we exclude Dr. Godiali from this, you're right in line with where you should be." Cisneros Dep. 49, ECF No. 28-13. Mr. Deloney wrote in his notes of the meeting:

> We had a long discussion on product mix. Her numbers are skewed because of the very large client she captured in 2012. Because of that client's profile and investments, Cristie's fixed annuity numbers are extremely high. Outside of that client, however, she has a significant amount in equity-indexed annuities which are highly scrutinized investments.

Deloney Meeting Notes, ECF No. 32-11.

Nothing between Cisneros's recollection of the meeting and Mr. Deloney's notes is inherently contradictory. Mr. Deloney notes that outside of the one client purchasing significant annuities "she has a significant amount in equity-indexed annuities." But this does not necessarily imply that her product mix, excluding Dr. Godiali, is out of line from expectations. Even if the conclusion could be drawn that Mr. Deloney was documenting concerns that were not voiced to Cisneros, that alone is insufficient to demonstrate that FirstMerit was "building a

file" against her. Here, like in *Oldham*, there are independent client complaints that allege improper annuity sales by Cisneros. Additionally, there is no other evidence of concern with Cisneros's product mix or other internal complaint consistent with Mr. Deloney's concerns until after customer complaints in late 2013 and early 2014. This argument does not establish causation.

### 2.

Next, Cisneros argues that her disparate treatment by supervisors is evidence of causation. Cisneros argues that she was treated differently from other similarly situated employees on four different occasions: when her sales goals were increased and other financial advisor's sales goals were decreased; when another financial advisor received a replacement branch and Cisneros did not; when Cisneros was denied a support assistant and others were provided an assistant; and when another financial advisor was permitted to take two incentive trips in one year and Cisneros was not.

"Evidence that the defendant treated the plaintiff differently from similarly situated employees . . . is relevant to causation." *Flones v. Beaumont Health Sys.*, 567 F. App'x 399, 408 (6th Cir. 2014). "[T]o be considered 'similarly-situated' . . . , the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects." *Mann v. Navicor Grp., LLC*, 488 F. App'x 994, 999 (6th Cir. 2012) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998)) (internal quotation marks omitted) (emendation in original). A court assessing whether employees are similarly situated "will assess certain factors in making this determination, such as whether the other employees have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating circumstances that would

distinguish their conduct or the employer's response." *Parks v. UPS Supply Chain Sols., Inc.*, 607 F. App'x 508, 515 (6th Cir. 2015).

**i.**

First, Cisneros claims that she had her sales goals increased while other top performing financial advisors had their sales goals decreased. The record does not support this assertion and Cisneros has not demonstrated that she and the relevant financial advisors who had their sales goals decreased were similarly situated in all relevant respects. Cisneros cites to one financial advisor in particular, Dave Jackson, who was the second highest performing financial advisor during 2013. She points out that his 2014 sales goal was actually decreased from his 2013 goal, despite having exceeded his 2013 target. But Cisneros does not explain anything else about Mr. Jackson.

FirstMerit, in its reply brief, explains that Mr. Jackson is actually located in a different state and has a different supervisor than Cisneros. Without offering particulars, FirstMerit further explains that a number of factors could have affected Mr. Jackson's lower target.

Also, when reviewing the two sales spreadsheets furnished by Cisneros, there is no evidence of a pattern whereby Cisneros was unfairly targeted for different treatment. A number of financial advisors saw their sales goals increase in 2014 after meeting their goals in 2013. Some financial advisors even saw their sales goals for 2014 increase to a level that exceeded their actual sales in 2013.

No evidence supports the conclusion that Cisneros suffered treatment different from a similarly situated employee when her sales goals were increased.

**ii.**

Next, Cisneros claims that another financial advisor, Emily Rush, was assigned a new branch to offset branches assigned to her that had closed. Cisneros also had a branch close and when she requested a replacement branch, that request was denied.

The record on this point is not entirely clear. First, Cisneros explains in her deposition that she was temporarily covering the Bay-Shattuck branch because FirstMerit was low on advisors. Her temporary coverage ended in February of 2014 and the branch was given to Emily Rush, presumably a new financial advisor. Cisneros goes on to explain that in February of 2014 "three or four [branches] in . . . the surrounding area" closed. Cisneros Dep. 91–92. One of those branches was assigned to Cisneros. She acknowledged in her deposition that the other branches that closed had a financial advisor assigned to them. *Id*. at 93. She then stated in her deposition that Emily Rush "had the rest of the branches" that closed. *Id*. But she then explained that Emily Rush did not suffer the loss of a branch the way that she did. She explained this by claiming that Emily Rush received offsetting branches: "She received Bay/Shattuck. I don't know what else she was going to receive, but I know she was receiving additional branches." *Id*.

Cisneros's testimony establishes that at least three branches in her area closed (possibly four), one of the branches that closed was assigned to Cisneros and Emily Rush "had the rest of the branches." *Id*. Thus, Emily Rush had at least two, possibly three branches close. Then, according to Cisneros, Rush received new branches to offset the branch closures. Which branches these were, Cisneros does not explain. Cisneros states only that Emily Rush received the Bay/Shattuck branch and that she did not know "what else [Rush] was going to receive," just that she "know[s Rush] was receiving additional branches." *Id*. This conclusory statement does not establish that Rush actually received other branches. Indeed, there is no evidence anywhere in the record that Rush received specific branches as compensation for some of her branches

closing. Taking Cisneros's contradictory account of the branch closures in a light most favorable to her, both Cisneros and Rush suffered an identical net loss of one branch.[3]

But the summary judgment standard is easily met, and Cisneros's testimony, although confusing and at times internally inconsistent, does demonstrate disparate treatment. Cisneros's testimony demonstrates that Emily Rush, the only other financial advisor in Cisneros's area, received at least one additional branch and Cisneros received none. This is sufficient to establish FMLA causation.

### iii.

Next, Cisneros claims she suffered disparate treatment when she was denied an individual support assistant and forced to use pooled support staff. Cisneros does not claim that she was treated differently from another, similarly situated employee. Rather, she claims that no one at FirstMerit was similarly situated to her and she was denied the preferential treatment that she deserves. See Cisneros Dep. 101 (explaining that other Financial Advisors had to use pooled service assistants but none were improperly denied individual support because they "didn't qualify for it"). This does not amount to a claim of disparate treatment because, by Cisneros's own admission, she has no comparator.

### iv.

Lastly, Cisneros argues that another employee, Wendy Mueller, was permitted to take two incentive trips in one year but Cisneros was told she could not do so. Cisneros does not establish that she and Ms. Mueller were similarly situated in all relevant respects. In fact, she admits in her deposition that Ms. Mueller took two incentive trips in one year while Cisneros and Ms. Mueller were employed by Citizens Republic Bancorp, prior to its acquisition by FirstMerit. There is no evidence that any of the supervisors that dissuaded Cisneros from taking two trips

---

[3] Rush could have potentially lost more branches if four, rather than three, branches closed.

were supervising Ms. Mueller at the time she took two trips. There is also no evidence that the management structure of Citizens at that time bore any relation to FirstMerit and LPL's management structure when Cisneros was told not to take two trips.

## C.

In light of the above, Cisneros is able to meet the causation prong of her prima facie case through the disparate treatment she alleges she suffered when she was denied a replacement branch. Defendants answer this claim by asserting that they, particularly FirstMerit, had a legitimate, nondiscriminatory reason for reassigning the Bay/Shattuck branch from Cisneros to Emily Rush. But that argument is irrelevant under the *McDonnell Douglas* burden-shifting framework, based on the way in which Cisneros has used that incident in her FMLA claim. Under the framework, "[o]nce the prima facie case is made, a defendant may offer any legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut by evidence of pretext." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). Here, the decision not to give Cisneros an additional branch is not the relevant adverse employment action. Her termination is. The decision not to assign Cisneros a replacement branch is simply potential proof that her FMLA leave was causally related to her termination. It is not itself an adverse employment action. Thus, any evidence that it was motivated by nondiscriminatory reasons is irrelevant.

## IV.

## A.

Having proven her prima facie case, the burden shifts to Defendants "to offer evidence of a legitimate, nondiscriminatory reason for [the] adverse action" taken against Cisneros. *Philbrick v. Holder*, 583 F. App'x 478, 482 (6th Cir. 2014).

- 14 -

Defendants proffer as a legitimate business reason for Cisneros's termination that she refused to sign and comply with performance improvement plans proposed by both Defendants. Because she refused to sign LPL's performance improvement plan her trading license was terminated. Because Cisneros's trading license was terminated, she was no longer qualified to be a financial advisor and FirstMerit terminated her employment.

This argument has some legitimacy. Cisneros was aware that if she did not sign the performance improvement plan with LPL, she would lose her license. She also knew that she needed her license to practice as financial advisor with FirstMerit.

## B.

When a Defendant proffers a legitimate nondiscriminatory reason for an adverse employment action, "the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could find that the stated reason is a pretext for discrimination." *Philbrick*, 583 F. App'x at 482. "A plaintiff may show pretext by demonstrating: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action].'" *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013) (quoting *Hedrick v. Western Reserve Care Sys.,* 355 F.3d 444, 460 (6th Cir. 2004)) (emendation in original). A plaintiff does not need to "'introduce additional, independent evidence of discrimination' to survive summary judgment." *Id*. at 492 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, (2000)).

Cisneros argues that, viewed in a broader context, her failure to sign the performance improvement plans were insufficient to warrant her discipline and termination. She was

presented with a performance improvement plan on May 9, 2014 as a result of customer complaints about the suitability of her sales.

According to Cisneros, however, in the lead-up to that meeting, there were attempts made to bring her performance into line that were not followed through on by FirstMerit management. One attempt occurred during a March 25, 2013 meeting with FirstMerit management. Specifically, FirstMerit management informed her that it would no longer be evaluating her product mix by excluding her largest client. Cisneros's largest client purchased exclusively annuities and accounted for a significant portion of her sales. Prior to this March 2013 meeting, FirstMerit evaluated the suitability of Cisneros's product mix without considering the outsize effect of her largest customer.

Additionally, following this meeting, Cisneros and one of her supervisors, Mark Kaeckmeister, scheduled meetings to work on the suitability of Cisneros's product mix and the products she presented to customers. According to Cisneros, Mr. Kaeckmeister "set up appointments for [them] to meet, and he did not show up for those meetings." Cisneros Dep. 112.

A reasonable jury could conclude that the change in the manner that Cisneros's sales balance was evaluated, and the lack of an effort by Mr. Kaeckmeister to constructively meet with Cisneros is evidence that Defendants' justification for their adverse actions was pretextual. That is, a reasonable jury could conclude that if FirstMerit properly performed its coaching function following the March 25, 2013 meeting, Cisneros would not have found herself in a position to be presented with a more elaborate and consequential performance improvement plan in May of 2014. Thus, the actions of FirstMerit leading to her termination could demonstrate that FirstMerit was not motivated by Cisneros's improper sales and inappropriate product mix because it did not take the remedial steps it had laid out over one year earlier.

**C.**

LPL offers its own explanation for why the termination of Cisneros's license was motivated by legitimate business reasons. But, since LPL and FirstMerit are joint employers, the secondary employer (LPL) shares the liability of the primary employer (FirstMerit). Thus, any attempts by LPL at evading liability by casting its actions as separate and distinct from the actions of FirstMerit are unavailing. Although a jury may conclude that LPL and FirstMerit are not joint employers, a reasonable juror could conclude that they are. Thus, for summary judgment standards, the two are tied for purposes of determining liability.

**IV.**

Accordingly, it is **ORDERED** that Plaintiff Cristie Cisneros's motion for reconsideration, ECF No. 44, is **GRANTED**.

It is further **ORDERED** that the Judgment of February 8, 2016, ECF No. 39, is **VACATED**.

It is further **ORDERED** that the Opinion and Order of February 8, 2016, ECF No. 38 is **AMENDED** in accordance with this opinion.

It is further **ORDERED** that Defendants FirstMerit Corporation and LPL Financial, LLC's motions for summary judgment, ECF Nos. 28 & 29, are **DENIED**.

Dated: April 26, 2016                                  s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 26, 2016.

                              s/Michael A. Sian
                              MICHAEL A. SIAN, Case Manager