UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CRISTIE CISNEROS,

        Plaintiff,                                                          Case No. 14-cv-14893

v.                                                                     Honorable Thomas L. Ludington

FIRSTMERIT CORPORATION and
LPL FINANCIAL, LLC,

        Defendants.

_____/

**OPINION AND ORDER DENYING MOTION FOR RECONSIDERATION**

On February 8, 2016 a Judgment in favor of Defendants FirstMerit Corporation and LPL Financial, LLC, was entered against Plaintiff Cristie Cisneros. Judgment was entered pursuant to the Court's February 8, 2016 Opinion and Order granting Defendants motions for summary judgment. The February 8 Opinion concluded that there was no genuine dispute of material fact that Cisneros was not terminated because she took leave under the Family and Medical Leave Act ("FMLA").

On February 22, 2016, Cisneros timely moved for reconsideration. She argues that the Court erred in determining that certain actions by FirstMerit and LPL were not adverse employment actions. She also argues that the Court erred by not considering additional evidence of causation beyond mere temporal proximity. On April 29, 2016, Cisneros's motion was granted on limited grounds, Defendants' motions for summary judgment were denied, and the judgment against her was vacated. See Apr. 29 Op., ECF No. 49 (herein "April 29 Opinion").

On May 3, 2016, it was the Defendants' turn. FirstMerit and LPL jointly moved for reconsideration of the Court's April 29 Opinion. They argue that the April 29 Opinion contained

two palpable defects. First, it incorrectly concluded that Cisneros was treated differently by not receiving a replacement branch when some of her assigned branches closed. Second, the April 29 Opinion adopted an incorrect date for a meeting between Cisneros and FirstMerit management. The opinion's analysis utilized the incorrect date resulting in a palpable defect. Defendants' motion will be denied.

### I.

Defendants do not dispute the general facts as conveyed in the Court's February 8, 2016 Opinion.[1] Those facts will be adopted as though fully recited herein. *See* Feb. 8, 2016 Op. & Order, ECF No. 38.

### II.

A motion for reconsideration will be granted if the moving party shows: "(1) a palpable defect, (2) the defect misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case." *Michigan Dept. of Treasury v. Michalec*, 181 F. Supp. 2d 731, 733-34 (E.D. Mich. 2002) (quoting E.D. Mich. LR 7.1(g)(3)). A "palpable defect" is "obvious, clear, unmistakable, manifest, or plain." *Id.* at 734 (citing *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 971 F. Supp. 2d 262, 278 (E.D. Mich. 1997).

### III.

Defendants make two claims for reconsideration. First, the April 26 Opinion erred by concluding that Cisneros was treated differently than Financial Advisor Emily Rush when Emily Rush allegedly received bank branches to replace branches she was previously assigned that closed and Cisneros did not. Second, the April 26 Opinion erred by misidentifying the date at

---

[1] Defendants do point out a factual error made in the Court's April 29, 2016 Opinion and Order granting Cisneros's motion for reconsideration. The April 29 Opinion incorrectly identifies the first meeting between Cisneros and FirstMerit management concerning her sales practices as occurring on March 25, 2013. The February 8 Opinion correctly identifies it as occurring on March 25, 2014. Those are the facts incorporated into this opinion. The error in the April 29 Opinion is addressed at length below.

which Cisneros was first informed of an impending performance improvement plan and misidentified the information conveyed to her during that meeting.

A.

Defendants argue that the April 26 Opinion errs by concluding that Cisneros was treated differently than Emily Rush. Defendants highlight the following passage from the Opinion:

> Cisneros's testimony establishes that at least three branches in her area closed (possibly four), one of the branches that closed was assigned to Cisneros and Emily Rush "had the rest of the branches." *Id*. Thus, Emily Rush had at least two, possibly three branches close. Then, according to Cisneros, Rush received new branches to offset the branch closures. Which branches these were, Cisneros does not explain. Cisneros states only that Emily Rush received the Bay/Shattuck branch and that she did not know "what else [Rush] was going to receive," just that she "know[s Rush] was receiving additional branches." *Id*. This conclusory statement does not establish that Rush actually received other branches. Indeed, there is no evidence anywhere in the record that Rush received specific branches as compensation for some of her branches closing. Taking Cisneros's contradictory account of the branch closures in a light most favorable to her, both Cisneros and Rush suffered an identical net loss of one branch.

April 26 Op. 12–13, ECF No. 49. Defendants' focus is on the conclusion that "there is no evidence anywhere in the record that Rush received specific branches as compensation for some of her branches closing" and the conclusion that "[t]aking Cisneros's contradictory account of the branch closures in a light most favorable to her, both Cisneros and Rush suffered an identical net loss of one branch." *Id*.

But it does not follow from those two conclusions that Cisneros was not treated differently than Rush. Those two conclusions serve to illustrate the narrow ground on which Cisneros's claim of disparate treatment survives. The first conclusion only clarifies that there is no evidence of Rush receiving any *specific* branch other than Bay/Shattuck. The conclusion is directed at Cisneros's claim that "she did not know 'what else [Rush] was going to receive,' just that she 'know[s Rush] was receiving additional branches.'" *Id*. The statement that there is no

evidence of Rush receiving specific branches as compensation for branch closures does not resolve Cisneros's explanation for why Rush received the Bay/Shattuck branch.

Similarly, the second conclusion only addresses the total number of branches assigned to Cisneros and Rush. Just because the two of them suffered an identical net loss does not mean that Cisneros was not treated differently than Rush. Cisneros's claim is that the disparate treatment followed her and Rush's request for offsetting branches. She contests that Rush's request was fulfilled while hers was denied. The total amount of branches lost to closures and the net resulting number of branches is probative of the question of disparate treatment but not, as Defendants suggest, dispositive.

To be clear, Cisneros claims that Rush also sought offsetting branches and received, at a minimum, the Bay/Shattuck branch.[2] Defendants repeatedly emphasize that Cisneros lost the Bay/Shattuck branch because the branch manager did not trust Cisneros to properly advise clients. That may be so, but that does not explain why the branch was reassigned to Emily Rush or rule out that it was reassigned after Rush asked for offsetting branches. It may be that Rush was the only other possible Financial Advisor that could cover that branch and that is why she received it. It may also be that Rush never asked for offsetting branches. There may be many reasonable explanations that would have merited summary judgment. None was proffered by Defendants and so a legitimate question of fact remains to be resolved by a jury.

Defendants claim on reconsideration that Emily Rush did request offsetting branches and, like Cisneros, Marc Kaeckmeister denied her request. Defendants cite to a specific portion of Mr. Kaeckmeister's transcript attesting to this fact. But the transcript nowhere states that Rush requested offsetting branches and only mentions Rush in passing:

---

[2] Cisneros claims that Rush received other, unnamed branches but as explained in the April 26 Opinion and above there is no evidence that those unnamed branches existed or that they were reassigned.

| | |
|---|---|
| Q | Okay. And were any of the branches that were closing assigned to Ms. Cisneros, if you know? |
| A | Yes. |
| Q | Do you recall at any time her requesting that the loss of her branch be offset by adding an additional branch to her assignment? |
| A | She requested more branches. |
| Q | Do you recall, was that a discussion she had directly with you? |
| A | Yes. |
| Q | Was anybody else involved in those discussions? |
| A | Well, there could be two different discussions. There was a discussion with Emily Rush that they brought to my attention instead of hiring a third advisor that they would absorb the rest of the territories, the rest of the book of business. And I declined that request. Cristie also wanted to pick up some branches but when branches are closing it didn't just affect Cristie, it affected all advisors, and to give her another branch I'm taking away from another advisor. And Cristie was not the only one that lost branches during this transition. |

Kaeckmeister Dep. 31, ECF No. 29-14. If anything, this portion of the deposition clarifies that Cisneros's request for offsetting branches was completely separate from another discussion involving Rush. The discussion involving Rush concerned a request by Rush and Cisneros to be assigned branches in their territory that would otherwise go to a third financial advisor. Attempting to portray this as a request by Rush for additional offsetting branches distorts the record.

Further, Mr. Kaeckmeister's explanation that branch closings "affected all advisors" does not establish that Rush did not receive offsetting branches. As explained above, Rush may have been affected by branch closures and still received an offsetting branch. *See supra* (explaining that Rush could have suffered a net loss of one branch and still received Bay/Shattuck as compensation).

Defendants argument for reconsideration on this ground will be denied.

**B.**

Second, Defendants claim that the Court erred by misidentifying the date of a performance improvement meeting Cisneros attended with FirstMerit Management. The April 29 Opinion erred in identifying the meeting as having occurred on March 25, 2013. The meeting actually took place on March 25, 2014. This was more than just a clerical error. The April 29 Opinion analyzed Cisneros's claims as though the meeting occurred on March 25, 2013. Correcting this error results in a modified analysis that greatly narrows the scope of Cisneros's pretext claim but it does not change the result of the April 29 Opinion.

The relevant portion of the April 29 Opinion that incorrectly analyzes the events between Cisneros's first coaching meeting and the meeting where Defendants presented her with performance improvement plans is as follows:

> According to Cisneros, however, in the lead-up to that meeting, there were attempts made to bring her performance into line that were not followed through on by FirstMerit management. One attempt occurred during a March 25, 2013 meeting with FirstMerit management. Specifically, FirstMerit management informed her that it would no longer be evaluating her product mix by excluding her largest client. Cisneros's largest client purchased exclusively annuities and accounted for a significant portion of her sales. Prior to this March 2013 meeting, FirstMerit evaluated the suitability of Cisneros's product mix without considering the outsize effect of her largest customer.
>
> Additionally, following this meeting, Cisneros and one of her supervisors, Mark Kaeckmeister, scheduled meetings to work on the suitability of Cisneros's product mix and the products she presented to customers. According to Cisneros, Mr. Kaeckmeister "set up appointments for [them] to meet, and he did not show up for those meetings." Cisneros Dep. 112.
>
> A reasonable jury could conclude that the change in the manner that Cisneros's sales balance was evaluated, and the lack of an effort by Mr. Kaeckmeister to constructively meet with Cisneros is evidence that Defendants' justification for their adverse actions was pretextual. That is, a reasonable jury could conclude that if FirstMerit properly performed its coaching function following the March 25, 2013 meeting, Cisneros would not have found herself in a position to be presented with a more elaborate and consequential performance improvement plan in May of 2014. Thus, the actions of FirstMerit leading to her termination could demonstrate that FirstMerit was not motivated by Cisneros's improper sales and

> inappropriate product mix because it did not take the remedial steps it had laid out over one year earlier.

Apr. 29 Op. 16, ECF No. 49. Some portions of this analysis must be amended. First, the gap between the initial coaching meeting and the presentation of the performance plans was not over one year, it was under two months. Second, Cisneros was aware that the second meeting would take place and that she would be presented with comprehensive performance improvement plans at that meeting.

Those corrections are significant. They greatly alter analysis of the Defendants' behavior, particularly FirstMerit, during the period between the two meetings. But neither the contracted time period between the coaching period and the performance improvement plan nor Cisneros' knowledge of the performance improvement plans proves that FirstMerit's behavior was not pretextual. A reasonable juror could still conclude that FirstMerit aimed at removing Cisneros rather than remedying what Defendants' viewed as poor practices. While Cisneros was going to inevitably be presented with performance improvement plans, she may have been amenable to agreeing to such a plan if FirstMerit had demonstrated in the period following the March 25, 2014 meeting that it was in fact invested in improving her performance. Instead, Mr. Kaeckmeister missed meetings and coaching opportunities that were scheduled between him and Cisneros. Thus, the April 29 Opinion's conclusion that "the actions of FirstMerit leading to her termination could demonstrate that FirstMerit was not motivated by Cisneros's improper sales and inappropriate product mix because it did not take the remedial steps it had laid out" on March 25, 2014 still applies. Indeed, it is bolstered by the fact that following Cisneros's termination Mr. Kaeckmeister himself assumed management of Dr. Godiali, the client that accounted for the great majority of Cisneros's sales, that led her to become the top financial advisor at FirstMerit and helped her earn two incentive trips in one year (one of which Cisneros

- 8 -

was not permitted to take and was instead taken by Mr. Kaeckmeister, Cisneros Dep. 89, ECF No. 29-12). There is little question that a reasonable juror could still determine that Defendants' proffered legitimate reasons for termination were pretextual.

**IV.**

Accordingly, it is **ORDERED** that Defendants FirstMerit Corporation and LPL Financial, LLC's motion for reconsideration, ECF No. 51, is **DENIED**.


Dated: June 15, 2016         s/Thomas L. Ludington
                             THOMAS L. LUDINGTON
                             United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 15, 2016.

s/LISA WAGNER_____
Lisa Wagner Acting in the Absence of
Michael A. Sian, Case Manager

---